Steven M. Morger (Bar No. 115108)
smorger@wendel.com
**WENDEL, ROSEN, BLACK & DEAN LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone: (510) 834-6600
Fax: (510) 834-1928

Thomas F. Mortimer, Jr. (Bar No. 150426)
**MORTIMER LAW FIRM**
1108 Sartori Avenue, Suite 320
Torrance, California 90501
Telephone: (310) 212-7673
Fax: (310) 218-4964

Attorneys for Plaintiff
Liberty City Movie, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LIBERTY CITY MOVIE, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> U.S. BANK NATIONAL ASSOCIATION, a National Banking Association, <br><br> Defendant. | Case No. 2:17-cv-6991 <br><br> **COMPLAINT OF LIBERTY CITY MOVIE, LLC FOR BREACH OF CONTRACT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

COMPLAINT OF LIBERTY CITY MOVIE, LLC
FOR BREACH OF CONTRACT

Plaintiff, through its counsel of record, claims against Defendant U.S. Bank National Association, as follows:

**OVERVIEW**

1.     A three party escrow was created between an escrow agent, a borrower and a lender.  The borrower was a limited liability company with two members:  a "managing member" vested with certain elements of operational control and a "manager member" who was the capital provider and the party with sole authority over the escrowed funds described herein.  This case is centered around the aforementioned escrow and the improper relationship that developed between the escrow agent and the "managing member" of the borrower.

2.     The escrow officer requested, and the "managing member" of the borrower agreed to pay, a success fee if the commercial loan associated with the escrow agreement was funded.  Neither the "managing member" nor the escrow agent disclosed this conflict of interest to the manager member of the borrower  who caused the actual capital to be deposited into the escrow on behalf of the borrower.  Instead, the escrow agent assured a representative of the manager member that the funds would be safe.

3.     The escrow agent breached the escrow agreement when the deposited funds were released directly to the "managing member," and not the borrower or manager member, in contravention to the terms of the escrow agreement.

**PARTIES**

4.     Plaintiff LCM is a Florida limited liability company that was created to oversee the financing, production, exploitation and distribution of the film *Liberty City: The American Dream.*

5.     Defendant U.S. Bank is a national banking association licensed to do business and doing business in Los Angeles, California with multiple offices throughout Los Angeles and the State of California and headquartered in Los Angeles at 633 W. 5th Street, Los Angeles, California 90071.

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

6.    Kim Galbraith is and was at all relevant times an executive in the Corporate Trust Services division of U.S. Bank and the escrow officer charged with the oversight and primary handling for the $708,000 that was caused to be deposited by the manager member in Liberty City Escrow Account (No. 161525000) with Defendant U.S. Bank.

<h3 style="text-align:center">FACTUAL BACKGROUND AND ALLEGATIONS</h3>

7.    In March 2012, LCM was formed by its members, The Reserve Entertainment Group, Inc. ("TREG") and Cutting Edge Stereoscope Motion Pictures, LLC ("CESMP") as a special purpose company to oversee the financing, production, exploitation and distribution of the film *Liberty City: The American Dream.* TREG was designated the managing member and CESMP the manager member. Attached as **Exhibit A** and incorporated herein by reference is a copy of LCM's Articles of Organization. The Articles of Organization were in the possession of U.S. Bank and produced by U.S. Bank in response to a subpoena sent by Stereoscope, LLC, in an arbitration proceeding against TREG and its principals.

8.    On March 23, 2012, LCM and CESMP executed a Preliminary Agreement Regarding The Motion Picture Liberty City (the "LCM Agreement"). The LCM Agreement contained various control and approval provisions granting CESMP and one of its members, Stereoscope, LLC ("Stereoscope"), certain rights and the management of the investor funds.  Attached as **Exhibit B** is a copy of the LCM Agreement.

9.    On April 25, 2012, LCM entered into an escrow agreement (the "Liberty City Escrow Agreement") with LCM as the borrower, EB Capital, LLC ("EB Capital") as the lender and U.S. Bank as escrow agent. Attached as **Exhibit C** is a copy of the Liberty City Escrow Agreement. The Liberty City Escrow Agreement makes clear it is governed by Nevada law which would include a six-year limitations period for claims of breach of contract. On April 27, 2012, $708,000 was transferred from the attorney trust account of Richard J. Garzilli, Esq.,

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1   CESMP's and Stereoscope's attorney, to escrow account no. 161525000 (the

2   "Liberty City Escrow Account") at U.S. Bank.

3        10.    On May 30, 2012, CESMP, acting as the manager member of LCM

4   through its co-managing member Stereoscope, sent a letter to Kim Galbraith that put

5   U.S. Bank on notice of a dispute and claim that called for the return of the $708,000

6   held by U.S. Bank in the Liberty City Escrow Account.

7        11.    Kim Galbraith responded that U.S. Bank was obligated to adhere only

8   to the terms of the Liberty City Escrow Agreement.[1]

9        12.    Jeff Pierce, CEO of Stereoscope, acting on behalf of CESMP, spoke

10   with Kim Galbraith later in the day on May 30, 2012. During this conversation, Mr.

11   Pierce expressed CESMP's concern over the safety of the deposited funds.

12   Specifically, CESMP was concerned that the deposited funds would be released to

13   either EB Capital or other third parties prior to the funding of LCM's film *Liberty*

14   *City: The American Dream.* Mr. Galbraith assured Mr. Pierce that the Liberty City

15   Escrow Agreement would be strictly adhered to by U.S. Bank.

16        13.    On November 20, 2012, unbeknownst to CESMP and contrary to the

17   terms of the LCM Agreement, LaMont Cain, CEO of TREG, sent instructions to

18   U.S. Bank requesting that $705,892 be wired to TREG's HSBC bank account. Mr.

19   Cain and Mr. Galbraith agreed that the full amount ($708,000) of the funds would

20   not be released so that the escrow would remain open with minimal amount of funds

21   remaining on deposit.  Despite prior assurances and in violation of the terms of the

22   Liberty City Movie Escrow Agreement, U.S. Bank wired $705,892 to TREG's

23   personal business bank account on November 21, 2012.[2] The escrow was not closed

24

25

26   [1] Attached as **Exhibit D** are copies of the letter sent by Stereoscope to U.S. Bank and Kim
      Galbraith's email response.

27   [2] Attached as **Exhibit E** are copies of TREG's November 20, 2012 instructions to U.S. Bank and
      U.S. Bank's wiring instructions.

28

COMPLAINT OF LIBERTY CITY MOVIE, LLC
FOR BREACH OF CONTRACT
        4

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

1   and remained in existence with the remaining funds.  No funds were released to

2   LCM.

3       14.    On December 7, 2016, while pursuing collection efforts related to its

4   arbitration award against TREG and its principals, CESMP first learned of U.S.

5   Bank's fraudulent relationship with TREG. Testimony from TREG principals

6   Lamont Cain and Allen Bates III revealed that EB Capital insisted that Kim

7   Galbraith and U.S. Bank replace CESMP's attorney as escrow agent and that Kim

8   Galbraith requested, and TREG agreed to pay, a success fee if the $25 million

9   commercial loan associated with the Liberty City Escrow Agreement was funded.[3]

10   This new information revealed to Plaintiff LCM that the fiduciary and contractual

11   duties owed to the Plaintiff by Defendant U.S. Bank as escrow agent were

12   abandoned in favor of a potentially more lucrative partnership with TREG.

13                  **FIRST CAUSE OF ACTION**

14                  **(BREACH OF CONTRACT)**

15            **[As Against Defendant U.S. Bank]**

16       15.    Plaintiff LCM hereby re-alleges and incorporates Paragraphs 1 through

17   14, inclusive, as though fully set forth herein.

18       16.    On April 25, 2012, Plaintiff LCM entered into the Liberty City Escrow

19   Agreement with LCM as the borrower (the "Borrower"), EB Capital, LLC as the

20   lender (the "Lender") and Defendant U.S. Bank as agent (the "Escrow Agent"). As

21   set forth in the agreement, the Borrower had applied for a $25 million commercial

22   loan from the Lender. A $708,000 deposit (the "Escrow Deposit") from Borrower

23   was required by Lender pending Lender's background check, due diligence and loan

24   approval process.

25

26

27   _____

[3] Attached as **Exhibits F and G,** respectively are the declarations of LaMont Cain and Allen Bates III.

28

17.     On April 27, 2012, $708,000 was transferred from the attorney trust account of Richard J. Garzilli, Esq., CESMP's and Stereoscope's attorney, to U.S. Bank Escrow Account No. 161525000.

18.     The purpose of the Liberty City Escrow Agreement was to protect LCM's Escrow Deposit by having U.S. Bank hold the funds until the commercial loan was funded. Absent the funding of the $25 million commercial loan from Lender, the Liberty City Escrow Agreement and subsequent correspondence clearly set forth that in all circumstances the Escrow Deposit be returned to Borrower.

19.     On November 20, 2012, LaMont Cain, CEO of TREG, sent instructions to U.S. Bank requesting that $705,892 be wired to TREG's personal HSBC business bank account. TREG is not LCM and was not a party to the Liberty City Escrow Agreement. LCM is not a wholly-owned subsidiary of TREG.

20.     Despite the clear terms of the Liberty City Escrow Agreement and the LCM Agreement, Defendant U.S. Bank, at the direction of U.S. Bank Vice President Kim Galbraith, wired $705,892 to TREG's (not LCM's) account on November 21, 2012, in direct breach of the Liberty City Escrow Agreement. At no time was the escrow closed by LCM nor did LCM approve the transfer of any funds from escrow.

21.     Pursuant to the Liberty City Escrow Agreement and proper protocols and standards of practice, U.S. Bank as a licensed and federally approved and insured escrow agent had a contractual duty to comply with the escrow agreement. Defendant U.S. Bank breached the Liberty City Escrow Agreement and ignored proper protocols and standards of practice by directly wiring the $705,892 to third party TREG's personal HSBC business account.

22.     U.S. Bank as Escrow Agent owed a contractual and fiduciary duty to LCM, not to any particular member of LCM.

23.     As a direct and proximate result of the above-described conduct and breaches of the Liberty City Escrow Agreement by Defendant U.S. Bank, Plaintiff

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

COMPLAINT OF LIBERTY CITY MOVIE, LLC
FOR BREACH OF CONTRACT

LCM has been prejudiced, harmed and damaged, has suffered financial loss related to the wrongful transfer of $708,000 to TREG, has incurred substantial attorneys' fees and costs to obtain the return of its monies and has suffered consequential damages related to the loss of use and disruption of Plantiff's business relationships, all in a specific amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Liberty City Movie, LLC, prays for judgment against Defendant U.S. Bank, as follows:

1.      For all special and economic damages reasonably incurred, including all significant hard financial losses and attorneys' fees and costs and damage and loss of reputation in the investor and film communities, all in excess of $708,000;

2.      For reasonable attorneys' fees and costs as allowed by the Court;

3.      For such other and further relief as the Court deems just and proper.


DATED:  September  21, 2017          MORTIMER LAW FIRM

WENDEL, ROSEN, BLACK & DEAN LLP



By:      _/s/ Steven M. Morger_____
          Steven M. Morger
          Attorneys for Plaintiff
          Liberty City Movie, LLC

Wendel, Rosen, Black & Dean LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

## Electronic Articles of Organization
### For
## Florida Limited Liability Company

L12000032694
FILED 8:00 AM
March 07, 2012
Sec. Of State
jbryan

### Article I

The name of the Limited Liability Company is:

LIBERTY CITY MOVIE, LLC

### Article II

The street address of the principal office of the Limited Liability Company is:

2941 N.W. 21ST STREET
FORT LAUDERDALE, FL. US 33311

The mailing address of the Limited Liability Company is:

9663 SANTA MONICA BLVD.
SUITE 441
BEVERLY HILLS, CA. US 90210

### Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

### Article IV

The name and Florida street address of the registered agent is:

THE RESERVE ENTERTAINMENT GROUP, INC.
2941 N.W. 21ST STREET
FORT LAUDERDALE, FL   33311

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   LAMONT CAIN, CEO, THE RESERVE ENT GROUP

## EXHIBIT A

-8-

USB 0023

## Article V

The name and address of managing members/managers are:

Title: MGRM
THE RESERVE ENTERTAINMENT GROUP, INC.
2941 21ST STREET
FORT LAUDERDALE, FL.  33311  US

Title: MGR
CUTTINGEDGESTEREOSCOPE MOTION PICTURES LLC
201 ST CHARLES AVE SUITE 3100
NEW ORLEANS, LA.  70170  US

L12000032694
FILED 8:00 AM
March 07, 2012
Sec. Of State
jbryan

## Article VI

The effective date for this Limited Liability Company shall be:

03/01/2012

Signature of member or an authorized representative of a member

Electronic Signature: LAMONT CAIN, CEO, THE RESERVE ENT GROUP

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

EXHIBIT A

-9-

**PRELIMINARY AGREEMENT REGARDING THE MOTION PICTURE *LIBERTY CITY***

AGREEMENT ("**Agreement**") between Liberty City Movie, LLC, a Florida limited liability company ("**Production Company**" or "**LCM**") formed by the film's rights holder **THE RESERVE ENTERTAINMENT GROUP, INC.,** a Florida corporation ("**TREG**") on the one hand, and **CUTTING/EDGE STEREOSCOPE MOTION PICTURES, LLC, a** Louisiana limited liability company ("**CESMP**") formed by **THE RESERVE ENTERTAINMENT GROUP, INC.,** a Florida corporation ("**TREG**"), and **STEREOSCOPE, LLC** ("**Stereoscope**"), a California limited liability company, in accordance with the Cutting Edge Pictures/ Stereoscope Joint Venture Agreement dated as of July 1, 2011, (the "**JV Agreement**") for the purpose of CESMP developing, fully financing and producing feature films projects. CESMP and the Production Company are sometimes referred to as "Party", individually, and as the "Parties" collectively.

*Whereas* Appendix B of the JV Agreement indicates that for each film to be made available to it, the option/purchase agreement is to be exercised with the option/purchase price paid and the production fully financed and produced by CESMP, a special purpose limited liability company will be formed with an operating agreement that will set out the unique aspects of the financing, production and exploitation for such film;

*Whereas*, the first motion picture project CESMP is to receive a "Produced by" credit is *Liberty City: The American Dream* (the "**Picture**") and the Production Company has been set up and is managed by TREG, which will receive a "Presents" credit, to oversee all aspects of the financing, production, exploitation and distribution of the Picture and Liberty City Movie, LLC shall be the borrower and financier under the production loan agreement with EB Capital, LLC ("East Bank") to provide the full production funding for the Picture on terms and conditions approved by TREG, its managing member, and CESMP, its member;

*Whereas*, the Parties desire to clarify the management of the activities of the Production Company pending the completion of a more formal operating agreement to be entered into by TREG, its managing member and CESMP, its member ("**Operating Agreement**"). The parties also wish to clarify and incorporate certain protections to individuals and entities (the "Investors") that have provided investment funds to CESMP.

NOW THEREFORE, the Parties agree to the following.

1.  **IMPACT AND CONTROLLING NATURE OF JV AGREEMENT.** The Parties acknowledge the intent of the JV Agreement as the governing document regarding the further development, financing, production and distribution of the Pictures made available to it and fully financed, produced and exploited by it and, as provided for in the JV Agreement, all decisions, commitments and agreements to be made by the Production Company regarding the Picture shall require the prior agreement of TREG its managing member and CESMP its member, and should the members reach an impasse, the final decision shall be made by the member who originated the property or picture which is consistent with the JV Agreement and will be set forth in the Production Company Operating Agreement.

2.  **INTERNAL CONTROLS.** In addition to the oversight of the completion bond company, International Film Guarantors ("IFG"), CESMP and LCM's managing member, TREG agrees that internal controls at the Production Company shall include, at a minimum, the following provisions:

1.  In accordance with the JV Agreement, TREG shall oversee all projected related finance and budgetary issues and all disbursements from the bank account(s) of the SPV production company will be approved by an authorized representative of TREG, the Production Company's managing member, by an authorized representative of Stereoscope, as a managing member of CESMP, and the Production Company's bondable unit production manager/line producer to be selected by TREG and



approved by EastBank Capital and CESMP will be notified of this selected and approved individual. At such time as the CESMP Investors have received full repayment of their investment funds plus the 10% additional return totaling $778.8K (USD), Stereoscope shall no longer have specific approval rights but will instead participate in oversight through its membership in CESMP which shall become a Managing Member of LCM in accordance with the provisions of paragraph 5;

2. Until such time as the Investors have received full repayment of their investment funds plus the 10% additional return, all checks, above a to be determined amount, shall require dual signatures with one signature to be from an authorized representative of TREG or Liberty City Movie LLC and one to be from an authorized representative of Stereoscope. After repayment to the CESMP Investors, all checks, above a to be determined amount, shall require dual signatures with one signature to be from an authorized representative of TREG and one to be from an authorized representative of Liberty City Movie, LLC, as the film's bondable unit production manager/line producer will be the selected authorized representative from the Production Company and all checks below, a to be determined amount, shall require one signature by an authorized representative of TREG or the Production Company; and

3. Bank reconciliations for the bank account(s) of the SPV Production Company are prepared monthly and approved by an authorized representative of TREG, and by an authorized representative of the Production Company, this being the Production Company's bondable unit production manager/line producer or the film's production accountant, with CESMP being provided verification of the monthly bank reconciliations.

4. All checks, written to CESMP investors shall require dual signatures with one signature to be from an authorized representative of TREG and one to be from an authorized representative of CESMP.

**3. ACKNOWLEDGEMENT OF INVESTOR AGREEMENTS.** CESMP has entered into various agreements with investors who have provided a total of $707,990 in investment funds to CESMP with such funds currently held in the attorney trust account of Richard J. Garzilli, Esq. Such agreements include a Film Finance Agreement, an Interim Escrow Agreement, a Secured Promissory Note Agreement, a Security Agreement and various amendments to the aforementioned agreements. The Production Company hereby acknowledges the content and intent of such agreements and agrees that it shall act in furtherance of such agreements and shall not purposefully take any action that would diminish or negatively impact the rights of the investors. In addition, the Parties acknowledge that Stereoscope is solely responsible for the investor relationships and the investor funds of $707,990 held in escrow, and accordingly, Stereoscope shall manage the investors and shall have approval over the investor management and shall provide the Production Company, as the borrower and party to the escrow agreement, clear instructions regarding the return of the investor funds, if necessary, under the escrow agreements holding such funds.

**4. OPERATING AGREEMENT.** The Parties shall enter into the Production Company Operating Agreement as soon as possible.

5. With respect to the film currently entitled "Liberty City: The American Dream", the parties agree that CESMP shall, as soon as the lender financing is made available to and received and controlled by Liberty City Movie, LLC ("LCM"), be named Managing Member of LCM thereby becoming co-Managing Member of LCM along with TREG with all final decisions residing with the member who originated the property or picture should the managing members arrive at an impasse on a decision. The profits, losses and tax attributes of LCM shall be allocated as initially agreed in the Joint Venture Agreement with Stereoscope having a floor back end participation of 15% and TREG and/or CEP having a floor back end participation of 65%.

6. The parties also agree that operating agreements for CESMP and Liberty City Movie, LLC will be negotiated in good faith and entered into prior to the execution of the commitment letter expected to be received from EB Capital, LLC ("East Bank") during the week of April 23, 2012. Additionally, as managing member of Liberty City Movie, LLC, TREG, recognizing that Stereoscope shall be the provider of 3D production and 3D post production services shall, utilizing input from Stereoscope

**EXHIBIT B**

regarding the prepared and presented 3D filming and 2D to 3D conversion rates, oversee, without limitations, all decisions regarding preparation of the draft and final budget for the film currently entitled "Liberty City: The American Dream". Upon completion of the final production budget, containing items mutually agreed upon by the parties, prepared by the line producer retained by TREG, the final budget shall be finalized as the version to present to East Bank and the completion bond company prior to execution of the East Bank commitment letter.

7. With respect to the pending loan transaction with East Bank and the escrow agreement by and between East Bank, LCM and U.S. Bank National Association ("U.S. Bank"), relative to the Liberty City Movie, LLC loan transaction, TREG, as managing member of LCM, agrees to: (i) update Stereoscope of any proposed changes to the escrow agreement prior to moving forward with such changes; and (ii) immediately share documentation and information received from East Bank or U.S. Bank relative to the loan or the escrow including but not limited to the funding Commitment letter, client references from lender, and proof of funds from lender. Furthermore TREG, as managing member of LCM, agrees to notify the Venture and/or Stereoscope upon its receipt of the funding Commitment letter from East Bank and shall review the terms and conditions of the funding Commitment Letter from East Bank with the Venture and/or Stereoscope and receive Stereoscope's approval, as a managing member of CESMP, of such Commitment Letter prior to execution by TREG or LCM and, in the event that the loan is to be cancelled for any reason, that Stereoscope shall be the party to specify and deliver the content of any written notices to TREG or LCM to be delivered by TREG or LCM to the U.S. Bank providing for the manner by which funds are returned to borrower. TREG and Stereoscope understand and agree that if funds are to be returned to the borrower in the event of a loan or escrow cancellation then the deposit of $708,000 (less escrow fees if applicable) shall be returned directly to the investors, per instructions provided to the escrow agent by LCM as the borrower, based on instructions provided by Stereoscope to TREG and/or LCM for the providers of $707,990 of the deposit with the remaining funds delivered to TREG.

8. LCM was established by the current rights holder of the first film, to be produced under this agreement and Liberty City Movie, LLC will be recognized as the financier of the first film currently entitled "Liberty City: The American Dream" and that LCM currently has the managing member as TREG and the member as CESMP. Upon the financing arranged by LCM being delivered, received and made available for use by LCM, CESMP shall then also become a managing member along with TREG. The members of LCM agree that upon CESMP becoming a managing member, the managing members shall agree on all matters related to the production and exploitation of the film. Should there be a split decision on any matters between the managing members the final decision shall be made by the member who originated the property or picture.

9. Based on the efforts expended to date, and with respect to the film currently entitled "Liberty City: The American Dream", Stereoscope and TREG hereby stipulate and agree that, notwithstanding the content of paragraph 8 with respect to LCM being the financier, Stereoscope and TREG have each fulfilled their respective obligations and there are no current obstacles to each side participating in the agreed to fees and participations. Additionally, each party agrees to continue its efforts in good faith to secure financing for all future film projects of the Venture.

10. **SEVERABILITY IN EVENT OF PARTIAL INVALIDITY.** If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.

EXHIBIT B

-12-

3

**11. MODIFICATION BY SUBSEQUENT AGREEMENT.** This Agreement may be modified by subsequent agreement of the parties only by an instrument in writing signed by both Parties.

**12. GOVERNING LAW; RESOLUTION OF DISPUTES.** In accordance with paragraph 20 of the JV Agreement, this Agreement has been entered into in the State of California and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of California applicable to contracts entered into and performed entirely within the State of California. The venue for any action, suit or proceeding arising from or based upon this Agreement shall be at Judicial Arbitration Mediation Services (JAMS) located in the County of Los Angeles in the State of California. In connection with the foregoing, the Parties agree to submit to and be bound by the jurisdiction of the appropriate State and Federal Courts located in the County of Los Angeles of the State of California.

Agreed to and executed this _____23_____ day of April, 2012:

CUTTING EDGE /STEREOSCOPE MOTION PICTURES, LLC

BY: _____     BY: _____

TITLE: Managing Member           TITLE: Managing Member

DATE: 4/23/12                     DATE: 4/23/12

LIBERTY CITY MOVIE, LLC

BY: _____

TITLE: Managing Member

DATE: 4/23/12

# EXHIBIT B

## -13-

## ESCROW AGREEMENT

The Escrow Agreement ("Escrow Agreement" herein) will be entered into _____ the _____ day of April 2012.

BETWEEN:    FBT CAPITAL, LLC ("Lender" herein) a limited liability company organized and existing under the laws of Nevada, with a business address at 230 Park Avenue, 10th Floor, New York, NY 10169.

AND:    LIBERTY CITY MOVIE, LLC ("Borrower" herein) a limited liability company organized and existing under the laws of Florida, with a business address at 2941 SW 21st Street, Ft. Lauderdale, FL 33311;

AND:    U.S. BANK NATIONAL ASSOCIATION ("Escrow Agent" herein) a national banking association

    WHEREAS, as of the date first appearing above, Borrower has applied for commercial financing in the amount of Twenty Five Million and 00/100 Dollars (USD $25,000,000.00) from the Lender ("Loan" herein);

    WHEREAS, the Lender has conditionally agreed to provide Borrower with the Loan pursuant to a Letter of Agreement ("LOA" herein), dated on or about Thursday, April 12th, 2012, as may be supplemented or amended thereafter;

    WHEREAS, a condition of the LOA requires the Lender to procure a Letter of Credit issued from a USA or Western European licensed Banking Institution having an "A" credit rating as defined by Standard & Poor's or Fitch Ratings ("Letter of Credit" herein) in the face value of the Loan as secondary collateral for said commercial financing; and

    WHEREAS, Borrower and the Lender hereby establish an Escrow Account (the "Escrow Account") with the Escrow Agent, to be maintained and administered in accordance with the Escrow Agreement. The Borrower shall deposit Seven Hundred Eight Thousand and 00/100 Dollars (USD $708,000.00) ("Escrow Deposit" or "Deposited Amount" herein) in the Escrow Account ("the Effective Date") pending Lender's background check, due diligence, and loan approval process.

    NOW, THEREFORE, for and in consideration of the mutual promises and covenants of the parties hereinafter contained, the parties hereby agree with each other as follows:

    1    The Borrower shall deliver the Escrow Deposit to the Escrow Agent to be held by said Escrow Agent under the following terms and conditions:

        A.    The Escrow Deposit shall be held in escrow until Lender confirms in writing to the Borrower and the Escrow Agent that the Loan is approved and is not subject to any contingencies; that the loan or transaction documents have been prepared and are fully executed and held by Lender; that first draw of the funds for the Loan will be wire transferred to the Borrower, upon Lender's receipt of the Letter of Credit; and that there are no impediments to proceeding with and Closing the Loan. Lender will issue written confirmation (the "Commitment Letter") that each of the requirements outlined above have been satisfied. A signed copy of the funding Commitment Letter ("Commitment" herein) by both Borrower and Lender will be provided by fax or e-mail in Adobe PDF, to the Escrow Agent. Escrow Agent agrees to follow the instructions of the release of funds in the mutually agreed upon funding Commitment by Borrower and Lender.

        B.    In the event that Lender determines in its sole discretion that it is unable or unwilling to proceed with the Loan as a result of Lender's review of the due diligence items, the Lender shall direct the Escrow Agent in writing that the Escrow Deposit shall be promptly returned to Borrower by the Escrow Agent by wire transfer, less the Escrow Agent fee (defined hereafter) deposited hereunder, less any applicable bank service charges, within Three (3) Business Days of Escrow Agent's receipt of written wire instructions from Borrower.



# EXHIBIT C

## -14-

## ESCROW AGREEMENT

C. Any direction/instruction required to be given by the Borrower and/or Lender will be in writing and signed by an Authorized Representative of either the Borrower or Lender, as applicable, per the attached Schedule II, which may be amended at any time by a current Authorized Representative of the Borrower or Lender as applicable.

2. Notwithstanding anything herein to the contrary, a Funding Commitment shall be executed by Borrower and Lender and placed in Escrow prior to Escrow Deposit being released from Escrow.

3. The Escrow Deposit shall be wired, pursuant to Escrow Agent's forthcoming wiring instructions to be included in the Escrow Agreement, by the Borrower within forty eight (48) hours or two (2) Business Days, after all parties have signed the Escrow Agreement, to the Escrow Account opened with Escrow Agent.

4. The Escrow Agreement shall be for a period of Ninety (90) Business Days from the Effective Date.

5. Lender agrees to deliver its Proof of Funds with Lending Capacity, to be accompanied with the delivery of the funding Commitment to the Borrower and written confirmation to the Escrow Agent, via fax or email in Adobe PDF, within Fifteen (15) Business Days of the Effective Date. In the event Lender does not deliver its Proof of Funds with Lending Capacity and funding Commitment to the Borrower within Fifteen (15) Business Days, then the Borrower will have the option of cancelling this Escrow Agreement and all Loan Agreements with the Lender and all monies of the Escrow Deposit shall be promptly returned to Borrower upon Borrower's written request to the Escrow Agent, less the Escrow Agent Fee deposited hereunder, less any applicable bank service charge, within Three (3) Business Days of Escrow Agent's receipt of written wiring instructions from Borrower.

6. Further, in the event the Loan is not closed within Forty-Five (45) Business Days of the receipt by Escrow Agent of the mutually agreed upon funding Commitment between Lender and Borrower, the Escrow Agreement will remain in effect unless the Borrower opts to terminate the Escrow Agreement by delivering written notice to the Escrow Agent with a copy to the Lender. Upon Escrow Agent's receipt of such notice, then all monies of the Escrow Deposit shall be promptly refunded to Borrower by the Escrow Agent via wire transfer, less the Escrow Agent Fee, deposited hereunder, less any applicable bank service charge, within Three (3) Business Days of Escrow Agent's receipt of written wire instructions from Borrower.

7. In the event, Borrower in its sole discretion is not completely satisfied with the Proof of Funds with Lending Capacity or funding Commitment received by Borrower from Lender, then all monies of the Escrow Deposit upon Borrower's written notice to the Escrow Agent with a copy to the Lender, shall be promptly refunded to Borrower by the Escrow Agent via wire transfer, less the Escrow Agent Fee, deposited hereunder, less any applicable bank service charge, within Three (3) Business Days of Escrow Agent's receipt of written wire instructions from Borrower

8. For the purposes of this Escrow Agreement, references to "Business Day" shall mean a day, which is not a Saturday or a Sunday on which a bank and the New York Stock Exchange are open for business. The Business Day shall terminate at 8:00 PM New York City local time.

9. The Escrow Agent shall, upon fully discharging its duties as herein outlined and making the payments required above, be released and discharged from all duties and obligations hereunder and neither party shall have any claim against the Escrow Agent thereafter.

10. The Parties hereto agree that, the Escrow Agent shall be entitled to an initial, non-refundable set-up fee ("Escrow Agent Fee" hereof of One Thousand, Two Hundred, Fifty and 00/100 Dollars ($1,250.00 USD), payable concurrently with the acceptance and execution of this Escrow Agreement to be deducted from the Escrow Deposit

11. **Escrow Agent's Duties**. Escrow Agent's duties and responsibilities shall be limited to those expressly set forth in this Escrow Agreement, and Escrow Agent shall not be subject to, or obliged to recognize, any other agreement between any or all of the Borrower's and Lender's parties or any other persons even though reference thereto may be made herein; provided, however, this Escrow Agreement may be amended at any time or times by an instrument in writing signed by all the Parties hereto. Escrow Agent shall not be subject to or obligated to recognize any notice, direction or instruction of any or all of the Parties hereto or of any other person, except as expressly provided for and authorized for and in performing any duties under the Escrow Agreement, Escrow Agent shall not be liable to any Party for consequential damages, (including, without limitation lost profits) losses, or expenses, except for gross negligence or willful misconduct on the part of the Escrow Agent

**EXHIBIT C**

-15-

## ESCROW AGREEMENT

12.     **Court Orders or Process.** If any controversy arises between the Parties to the Escrow Agreement, or with any other Party, concerning the subject matter of the Escrow Agreement, its terms or conditions, Escrow Agent will not be required to determine the controversy or to take any action regarding it. Escrow Agent may hold all documents and funds and may wait for settlement of any such controversy by final appropriate legal proceedings or other means as, in Escrow Agent's discretion, Escrow Agent may require, despite what may be set forth elsewhere in the Escrow Agreement. In such event, Escrow Agent will not be liable for interest or damage. Escrow Agent is authorized, in its sole discretion, to comply with orders issued or process entered by any court with respect to the Escrow Account, the Assets or the Escrow Agreement, without determination by the Escrow Agent of such court's jurisdiction in matter. If any Assets are at any time attached, garnished, or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then in any such events Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel of its own choosing is binding upon it; and if Escrow Agent complies with any such order writ, judgment or decree, it shall not be liable to any of the Borrower's or Lender's parties or to any other person, firm or corporation by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

13.     **Escrow Agent's Actions and Reliance.** Escrow Agent shall not be personally liable for any act taken or omitted by it hereunder if taken or omitted by it in good faith and in the exercise of its own best judgment. Escrow Agent shall also be fully protected in relying upon any written notice, instruction, direction, certificate or document which in good faith it believes to be genuine.

14.     **Collections.** Unless otherwise specifically indicated in this Agreement, Escrow Agent shall proceed as soon as practicable to collect any checks, interest due, matured principal or other collection items with respect to Assets at any time deposited in the Escrow Account. All such collections shall be subject to the usual collection procedures regarding items received by Escrow Agent for deposit or collection. Escrow Agent shall not be responsible for any collections with respect to Escrow Account Assets if Escrow Agent is not registered as record owner thereof or otherwise is not entitled to request or receive payment thereof as a matter of legal or contractual right. All collection payments shall be deposited to the Escrow Account. Escrow Agent shall not be required or have a duty to notify anyone of any payment or maturity under the terms of any instrument, security or obligation deposited in the Escrow Account, nor to take any legal action to enforce payment of any check, instrument or other security deposited in the Escrow Account. The Escrow Account is a safekeeping Escrow Account, and no interest shall be paid by Escrow Agent on any money deposited or held therein, except as provided in Section 6 hereof.

15.     **Legal Counsel.** If Escrow Agent believes it to be reasonably necessary to consult with counsel concerning any of its duties in connection with the account or this Escrow Agreement, or in case Escrow Agent becomes involved in litigation on account of being Escrow Agent hereunder or on account of having received property subject hereto, then in either case, its costs, expenses, and reasonable attorney's fees shall be paid by Borrower.

16.     **Escrow Agent Responsibility.** Escrow Agent shall not be responsible or liable for the sufficiency or accuracy of the form, execution, validity or genuineness of documents, instruments or securities now or hereafter deposited in the Escrow Account, or of any endorsement thereon, or for any lack of endorsement thereon, or for any description therein. Registered ownership of or other legal title to Assets deposited in the Escrow Account shall be maintained in the name of Escrow Agent, or its nominee. Escrow Agent may maintain qualifying Assets in a Federal Reserve Bank or in any registered clearing agency (including, without limitation, the Depository Trust Company) as Escrow Agent may select, and may register such deposited Assets in the name of Escrow Agent or its agent or nominee on the records of such Federal Reserve Bank or such registered clearing agency or a nominee of either. Escrow Agent shall not be responsible or liable in any respect on account of the identity, authority or rights of the persons executing or delivering or purporting to execute or deliver any such document, security or endorsement of the Escrow Agreement.

EXHBIT C

## ESCROW AGREEMENT

17.     **Investments.** Escrow Agent is hereby directed to deposit and invest funds in the Bank's Money Market Savings Account. Borrower acknowledges that the Bank's Money Market account is a National Banking Association ("Bank" herein) interest-bearing money market deposit account designed to meet the needs of the Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of Bank. Selection of this investment includes authorization to place funds on deposit with Bank. The Bank uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account. Interest rates currently offered on the accounts are determined at the Bank's discretion and may be based by customer deposit amount. The owner of the accounts is the Bank as Escrow Agent for its trust customers. The Bank's trust department performs all account deposits and withdrawals. Each customer's deposit is insured by the Federal Deposit Insurance Corporation as determined under FDIC Regulations, up to applicable FDIC limits. Any and all interest earned on the Assets after the deposit shall be added to the Assets and shall become a part thereof. Escrow Agent shall thereafter hold, maintain and utilize the Assets pursuant to the terms and conditions of this Escrow Agreement. Borrower shall provide Escrow Agent with a W-9 or original W-8 IRS tax form prior to the disbursement of interest and Escrow Agent will file the appropriate 1099 or other required forms pursuant to Federal and State laws. A statement of citizenship will be provided if requested by Escrow Agent. Escrow Agent shall not be responsible for maximizing the yield on the Assets. Escrow Agent shall not be liable for losses, penalties or charges incurred upon any sale or purchase of any such investment.

18.     **Notices/Directions to Escrow Agent.** Notices and directions to Escrow Agent from Borrower, Lender or their other persons authorized to give such notices or directions, shall be in writing and signed by an authorized representative as identified pursuant to Schedule II, and shall not be deemed to be given until actually received by Escrow Agent's Bank Employee or Bank Officer who administers the Escrow Account. Escrow Agent shall not be responsible or liable for the authenticity or accuracy of notices or directions properly given hereunder if the written form and execution thereof on its face purports to satisfy the requirements applicable, as determined by Escrow Agent in good faith without additional confirmation or investigation.

19.     **Books and Records.** Escrow Agent shall maintain books and records regarding its administration of the Escrow Account, and the deposit, investment, collections and disbursement or transfer of Assets, shall retain copies of all written notices and directions sent or received by it in the performance of its duties hereunder, and shall afford the Borrower reasonable access, during regular business hours, to review and make photocopies (at Borrower's cost) of the same.

20.     **Disputes Among the Parties hereto and/or Third Parties.** In the event Escrow Agent is notified of any dispute, disagreement or legal action between or among any of the Parties hereto, and/or any third parties, relating to or arising in connection with the Escrow Account, the Assets or the performance of the Escrow Agent's duties under this Escrow Agreement, the Escrow Agent shall be authorized and entitled, subject to Section 2 hereof, to suspend further performance hereunder, to retain and hold the Assets then in the Escrow Account and take no further action with respect thereto until the matter has been fully resolved, as evidenced by written notification signed by all Parties hereto and any other parties to such dispute, disagreement or legal action.

21.     **Notice by Escrow Agent.** Any notices which Escrow Agent is required or desires to give hereunder to any of the Parties hereto shall be in writing and may be given by mailing the same to the address indicated below opposite the signature of such Party (or to such other address as said Party may have theretofore substituted therefor by written notification to Escrow Agent) by United States certified or registered mail, postage prepaid. For all purposes hereof any notice so mailed shall be as effectual as though served upon the person of the Party to whom it was mailed at the time it is deposited in the United States mail by Escrow Agent whether or not such undersigned thereafter actually receives such notice. Whenever under the terms hereof the time for Escrow Agent's giving a notice or performing an act falls upon a Saturday, Sunday, or holiday, such time shall be extended to the next business day.

22.     Escrow Agent shall be paid a fee for its services as set forth herein and incorporated herein, which shall be subject to increase upon notice sent to the parties herein, and reimbursed for its reasonable costs and expenses incurred. In the event that the conditions of this Escrow Agreement are not promptly fulfilled, or if Escrow Agent renders any service not provided for in the Escrow Agreement, or if the parties request a substantial modification of its terms, or if any controversy arises, or if Escrow Agent is made a party to, or otherwise in, any litigation pertaining to the Escrow Agreement or its subject matter, Escrow Agent shall be reasonably compensated for such extraordinary services and reimbursed for all costs, attorney's fees, including allocated costs of in-house counsel, and expenses occasioned by such default, delay, controversy or litigation and Escrow Agent shall have the right to retain all documents and/or other things of value at any time held by Escrow Agent in the Escrow Agreement until such compensation, fees, costs, and expenses are paid. The parties jointly and severally promise to pay these sums upon demand. The parties agree that all of the Escrow Agent's usual fees and charges may be deducted from the Escrow Deposit as stated in Section 10 above. The Borrower, Lender and their respective successors and assigns agree jointly and severally to indemnify and hold Escrow Agent harmless against any and all losses, claims, damages, liabilities, and expenses, including reasonable costs of investigation, counsel fees, including allocated costs of in-house counsel and disbursements that may be imposed on Escrow Agent or incurred by Escrow Agent in connection with the performance of his/her duties under the Escrow Agreement, including but not limited to any litigation arising from the Escrow Agreement or involving its subject matter. Escrow Agent shall have a first lien on the property and papers held under the Escrow Agreement for such compensation and expenses.

# EXHIBIT C

-17-

## ESCROW AGREEMENT

23.    **Escrow Agent Resignation.**  It is understood that Escrow Agent reserves the right to resign at any time by giving written notice of its resignation, specifying the effective date thereof, to the Borrower and Lender.  Within 30 days after receiving the aforesaid notice, the Borrower and Lender jointly agree to appoint a successor Escrow Agent to whom the Escrow Agent herein may transfer the Assets then held in the Escrow Account, less its unpaid fees, costs and expenses.  If a successor Escrow Agent has not been appointed and has not accepted such appointment by the end of the 30-day period, the Escrow Agent herein may apply to a court of competent jurisdiction for the appointment of a successor Escrow Agent, and the costs, expenses and reasonable attorney's fees which Escrow Agent incurs in connection with such a proceeding shall be paid by the Borrower.

24.    **Escrow Termination.**  If, the Escrow Agreement shall not have previously terminated, then it shall terminate Ninety (90) Business Days from the Effective Date, at which time the Assets then held in the Escrow Account, less Escrow Agent's unpaid fees, costs and expenses shall be distributed to the Borrower, within Three (3) Business Days of Escrow Agent's receipt of written wire instructions from the Borrower.

25.    **Governing Law.**  This Escrow Agreement shall be construed, enforced, and administered in accordance with the laws of the State of Nevada.

26.    **Automatic Succession.**  Any company into which the Escrow Agent may be merged or with which it may be consolidated, or any company to whom Escrow Agent may transfer a substantial amount of its Escrow business, shall be the Successor to the Escrow Agent without the execution or filing of any paper or any further act on the part of any of the Parties, anything herein to the contrary notwithstanding.

27.    **Disclosure.**  The Parties hereto hereby agree not to use the name of the BANK to imply an association with the transaction other than that of a legal Escrow Agent.

28.    **Brokerage Confirmations.**  The Parties acknowledge that to the extent regulations of the Comptroller of Currency or other applicable regulatory entity grant a right to receive brokerage confirmations of security transactions or the escrow, the Parties waive receipt of such confirmations, to the extent permitted by law.  The Escrow Agent shall furnish a statement of security transactions on its regular monthly reports.

29.    **Counterparts.**  The Escrow Agreement may be executed in any number of counterparts, each of which shall be deemed to be one and the same instrument.  The exchange of copies of the Escrow Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of the Escrow Agreement as to the Parties and may be used in lieu of the original Escrow Agreement for all purposes.  Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

**EXHIBIT C**

-18-

<u>ESCROW AGREEMENT</u>

IN WITNESS WHEREOF, the undersigned have affixed their signatures and hereby adopt as part of this instrument Schedules I, II, and III, which are incorporated by reference.

DEPOSITOR: LIBERTY CITY MOVIE, LLC

By: _____

Its: _____

2941 SW 21st Street
(Address)

Ft. Lauderdale, FL 34311
(City, State and Zip Code)

(310) 871-3194
(Telephone)

(310) 388-0956
(Telecopy Number)

Tax I.D.: 15-4725820

LENDER: EB CAPITAL, LLC

By: _Joshua W. Estes_____

Its: __Managing Member_____

230 Park Avenue, 10th Floor
(Address)

New York, NY 10169
(City, State and Zip Code)

(646) 350-2967
(Telephone)

(646) 350-4557
(Telecopy Number)

Tax I.D.: 61-1683968

U.S. BANK NATIONAL ASSOCIATION,
as Agent

By: _____

Its: _Vice President_____
(signed April 26, 2013)

<u>Notices to Agent shall be sent to:</u>

U.S. Bank Corporate Trust Services
60 Livingston Avenue
EP-MN-WS3T
St. Paul, MN 55107-2292
Attn: Oladeye Fadahunsi
(651) 495-3726
(651) 495-8087 (fax)

With Fax Copy to:
Kim R. Galbraith
(801) 534-6085
(801) 534-6013 (fax)

EXHIBIT C

-19-

<u>ESCROW AGREEMENT</u>

<u>SCHEDULE I</u>

<u>DEPOSITS</u>

The Borrower shall deposit Seven Hundred Eight Thousand and 00/100 Dollars (USD $708,000.00) with the Escrow Agent.

REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

EXHIBIT C

-20-

ESCROW AGREEMENT

SCHEDULE II

AUTHORIZED REPRESENTATIVES

HB CAPITAL, LLC.

Name: _____
              Specimen Signature

Name: _____
              Specimen Signature

LIBERTY CITY MOVIE, LLC'S

Name: _____
              Specimen Signature

Name: _____
              Specimen Signature

EXHIBIT C

-21-

**ESCROW AGREEMENT**

**SCHEDULE III**

**SCHEDULE OF FEES FOR SERVICES AS
ESCROW AGENT**

For

LB CAPITAL, LLC / LIBERTY CITY MOVIE, LLC

Escrow Account approval is subject to review and qualification. Fees are subject to change at Bank's discretion and upon written notice. Fees paid in advance will not be prorated. The fees set forth above and any subsequent modifications thereof are part of the Escrow Agreement. Finalization of the transaction constitutes agreement to the above fees, including agreement to any subsequent changes upon proper written notice. In the event the transaction is not finalized, any related out-of-pocket expenses will be billed to the Borrower directly. Absent Borrower's written instructions to sweep or otherwise invest, all sums in the Escrow Account will remain un-invested and no accrued interest or other compensation will be credited to the account. Payment of fees constitutes acceptance of the terms and conditions set forth.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ESCROW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

I am a non-individual person, such as a business entity, a charity, a Trust or other legal entity, we will ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, and identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

**EXHIBIT C**

-22-



May 30, 2012

**Mr. Kim R. Galbraith**
US Bank National Association
60 Livingston Dr. St. Paul, MN 55107

Re: Liberty City Movie, LLC, EastBank Capital Escrow

Dear **Mr. Galbraith**

Stereoscope, LLC as a member of Cutting Edge / Stereoscope Motion Pictures, LLC
which in turn is a member of Liberty City Movie, LLC hereby puts you on notice of third
party claims against the $708,000 held by U.S. Bank in escrow for purposes of the
Liberty City film finance transaction involving EB Capital, LLC and Liberty City Movie,
LLC. There are a number of investors in the Liberty City project who have provided the
$708,000 deposit memorialized by film finance agreements and who are now seeking a
return of their capital and a cancellation of the U.S. Bank escrow. We hereby request that
U.S. Bank hold the funds and not transfer such funds for any reason until the issues with
the third party investors are resolved.

Please confirm receipt of the email correspondence.

Sincerely,

Jeff Pierce CEO
Stereoscope, LLC
jeff@stereoscopellc.com
Ph. 818-729-0372
Fax 818-729-0374

Copies to be forwarded to:
Josh Estes, EastBank Capital
Allen Bates III, Liberty City Movie, LLC

**EXHIBIT D**

-23-

Stereoscope Studios Mail - Fwd: Liberty City Movie: EastBank Capital Escrow                    Page 1 of 3



Dave Kissell < dave.kissell@stereoscopellc.com>

## Fwd: Liberty City Movie: EastBank Capital Escrow
2 messages

Jeff Pierce < jeff.pierce@stereoscopellc.com>                              Wed, May 30, 2012 at 7:03 AM
To: Clint Cronkite <clint@ckvalue.com>, Dave Kissell <dave.kissell@stereoscopellc.com>, Richard Garzilli
<rgarzilli@richardgarzilli.com>

---------- Forwarded message ----------
From: <KIM.GALBRAITH@usbank.com>
Date: Wed, May 30, 2012 at 6:21 AM
Subject: Re: Liberty City Movie: EastBank Capital Escrow
To: Jeff Pierce <jeff.pierce@stereoscopellc.com>
Cc: Richard Garzilli <rgarzilli@richardgarzilli.com>


Jeff:

I hereby acknowledge receipt of the email and attachment sent by
Stereoscope, LLC on May 30, 2012.

Until we review the Escrow Agreement in detail, I cannot respond to
your request to "hold funds and not transfer such funds". You, or
your firm, are not parties to the Escrow Agreement and in our
independent role as agent, we are obligated to adhere only to the
direction of the agreement between the two parties you indicate in
your letter.

Sincerely,

Kim

Kim R. Galbraith
U.S. Bank National Association
Corporate Trust Services
170 South Main Street, Suite 200
Salt Lake City, UT 84101
Phone: 801-534-6083
Fax: 801-534-6013

To be in compliance with privacy and regulatory rules relating to the
Gramm-Leach-Bailey Privacy Act, Sarbanes-Oxley-SOX compliance, Right
to Financial Privacy Act, and HIPAA regulations, this email may be
sent via Secure Mail which provides a secure/encrypted path for the
email to be retrieved.



From:      Jeff Pierce <jeff.pierce@stereoscopellc.com>
To:        kim.galbraith@usbank.com
Cc:        Richard Garzilli <rgarzilli@richardgarzilli.com>
Date:      05/30/2012 06:42 AM

## EXHIBIT E

Stereoscope Studios Mail - Fwd: Liberty City Movie: EastBank Capital Escrow                    Page 2 of 3

Subject:       Liberty City Movie: EastBank Capital Escow

Dear Mr. Galbraith,

Please find attached a letter in .pdf format that requires your
immediate attention.  Confirmation of your receipt of this email and
successful retrieval of the attached file is requested.

Thank you for your timely action.

Sincerely,

Jeff Pierce

--
Jeff Pierce CEO
Stereoscope, LLC

727 N. Victory Blvd.
Burbank, CA 91502
O - (818) 729-0372
C - (818) 397-2737
jeff.pierce@stereoscopellc.com

U.S. BANCORP made the following annotations

Electronic Privacy Notice. This e-mail, and any attachments, contains
information that is, or may be, covered by electronic communications
privacy laws, and is also confidential and proprietary in nature. If
you are not the intended recipient, please be advised that you are
legally prohibited from retaining, using, copying, distributing, or
otherwise disclosing this information in any manner. Instead, please
reply to the sender that you have received this communication in
error, and then immediately delete it. Thank you in advance for your
cooperation.

Jeff Pierce CEO
Stereoscope, LLC

727 N. Victory Blvd.
Burbank, CA 91502
O - (818) 729-0372
C - (818) 397-2737
jeff.pierce@stereoscopellc.com

Letter to USBank to hold escrow.pdf
159K

Dave Kissell < dave.kissell@stereoscopellc.com>          **EXHIBIT E**          Wed, Mar 12, 2014 at 10:00 AM
To: Clint Cronkite <clint@ckvalue.com>
                                                              -25-

Below is the email chain including acknowledgement by Kim Galbraith of receipt of Jeff's letter.

[Quoted text hidden]

**Letter to USBank to hold escrow.pdf**
159K



161525000

November 20, 2012

Liberty City Movie, LLC / EB Capital Escrow Account
Funds Wiring Instructions

To: Kim Galbraith
U.S. Bank National Association
Corporate Trust Services
170 South Main Street, Suite 200
Salt Lake City, UT 84101

From: LaMont Cain
Liberty City Movie, LLC
c/o The Reserve Entertainment Group, Inc.
9663 Santa Monica Blvd. STE. 441
Beverly Hills, CA 90210

Re: Liberty City Movie, LLC/EB Capital Escrow Account Funds Wiring Instructions

Mr. Galbraith,

In accordance with the Escrow Agreement dated April 25, 2012 fully executed by and between Liberty City Movie, LLC ("Borrower"), EastBank Capital ("Lender") and US Bank ("Escrow Agent"), regarding our deposit in the amount of $708,000 into the Liberty City Movie, LLC / EB Capital Escrow Account, we Liberty City Movie, LLC, the Borrower, hereby provide to you Escrow Agent, the following wiring instructions effective this 20th day of November 2012 for the no less than $706,892.96 in funds currently on deposit in the Liberty City Movie, LLC / EB Capital U.S. Bank Escrow Account (Acct# 161525000).

A)     A total of $705,892.00 shall be wired on November 21, 2012 to the production account of The Reserve Entertainment Group, Inc. at:

HSBC Bank
354 6th Avenue, New York, NY 10011
Account Number: 600760596, Routing Number: 021001088

The non-transferred funds shall remain in the above referenced escrow account and the account shall remain open and active.  Unless Escrow Agent is otherwise instructed by Borrower at a later date, the above stated wiring instructions are hereby considered irrevocable.

IN WITNESS WHEREOF, the undersigned has provided these wiring instructions, effective the day and year first above written,

Borrower: Liberty City Movie, LLC

By: _____
LaMont Cain
Chairman & CEO of The Reserve Entertainment Group, Inc.

Its: Managing Member
Date: November 20, 2012

# EXHIBIT E

USB 0016



## DECLARATION OF LAMONT CAIN

I, LaMont Cain, do hereby state and declare:

1.  I am the former Chairman and Chief Executive Officer of the Beverly Hills, California based film production company, The Reserve Entertainment Group, Inc. ("TREG"). If called as a witness, I could and would testify to the following:

2.  In July of 2011, TREG through its wholly owned subsidiary Cutting Edge Pictures, Inc. entered into a joint venture with a Burbank, California based production company known as Stereoscope, LLC ("Stereoscope").

3.  I was introduced to Josh Estes, principal with Quest Capital Finance, by a loan broker for the purpose of securing financing for our proposed film projects.

4.  Quest Capital Finance had various lending programs for film production financing including one which required a good faith deposit equal to 4% of the overall loan amount with such good faith funds to be placed in an escrow account pending closing of the loan at which point the funds would be released back to the party providing the initial funds.

5.  Stereoscope raised $708,000 from various investors with such funds to serve as a good faith deposit as required by our lender Quest Capital Finance and for purposes of our first joint film with Stereoscope, Liberty City.

6.  Initially it was contemplated that Stereoscope's attorney Richard Garzilli would serve as the escrow agent.

**EXHIBIT F**

-28-

- 1 -

7.    Prior to opening of escrow, Josh Estes informed me that it was a requirement of the loan that we use U.S. Bank for escrow purposes and specifically that the escrow agent had to be Kim Galbraith who was a Vice President at U.S. Bank's Salt Lake City office.

8.    Prior to the funds transfer by Stereoscope, Josh Estes and his associates created a new lending company known as EB Capital, LLC ("EB Capital") with such new lender becoming the film production financier.

9.    I understand from statements made to me by Josh Estes and Kim Galbraith that Josh Estes has a long-standing personal relationship with Kim Galbraith and that they have worked on multiple projects together.

10.    Upon identification of the account coordinates, escrow agent and escrow institution, Garzilli then wired the deposit of $708,000 to U.S. Bank.

11.    I spoke to Josh Estes about E. B. Capital holding the Executive Producer title for the Liberty City movie project and further that U.S. Bank would be participating on their side as the guarantor. Mr. Estes indicated that both he or EB Capital and Kim Galbraith or US Bank would be and/or serve as the Executive Producer of the film.L I did confirm with Kim Galbraith that U.S. BANK would be the Guarantor for the movies to be financed by EB Capital.

12.    I recall speaking to Mr. Estes about the U.S. BANK / Kim Galbraith producer fees coming from the share of producer fees allocable to EB Capital. I assumed those fees were to go to Kim Galbraith.

**EXHIBIT F**

- 2 -

DECLARATION OF LAMONT CAIN                    -29-

13.    Stereoscope sent a notice to Kim Galbraith in May of 2012 indicating that the investors were seeking a return of their deposit. Mr. Galbraith confirmed to me that he received this notice. However, U.S. Bank did not release the third party investor funds pursuant to this notice.

14.    In early November of 2012, Stereoscope indicated to me that it would be bringing a legal action seeking a return of the escrowed third party investor funds.

15.    I received a formal Demand for Arbitration from Stereoscope's attorneys.

16.    Upon learning of the pending legal action, Allen Bates and I approached Kim Galbraith and requested that the third party Stereoscope investor funds be released from escrow and sent directly and immediately to TREG's corporate bank account.

17.    Kim Galbraith counseled and directed us on how to best remove the third party Stereoscope investor funds from the escrow without notice to Stereoscope and ultimately we acted under a termination clause of the escrow agreement.

18.    Although we acted under a termination clause to access the funds, Josh Estes counseled us and directed us to keep the account open with a nominal balance in place to avoid notice to Stereoscope or any other third party. It was my understanding from comments made by Josh Estes that Josh Estes informed and directed Kim Galbraith of this.

**EXHIBIT F**

-30-

- 3 -

DECLARATION OF LAMONT CAIN

19. Neither Kim Galbraith nor anyone else at U.S. Bank ever apprised us that removing the escrow funds or taking an interim advance was prohibited by the terms of the escrow agreement.

20. The release of funds was quickly facilitated by Kim Galbraith and U.S. Bank and the funds were transferred directly to TREG's corporate bank account. TREG was not a direct party to the escrow agreement with U.S. Bank.

21. Kim Galbraith and U.S. Bank knew and understood that the funds belonged to the third party Stereoscope investors and that the funds transfer was not authorized by or disclosed to Stereoscope or Stereoscope's investors.

22. It was my ultimate intent to return the funds to the escrow account so as to make Stereoscope and its' investors whole.

23. Josh Estes advised us to create a new entity for the purposes of establishing a new escrow account and to apply for a new loan to finance the Liberty City movie project. The newly created entity was Checkmate Film Funding, LLC ("Checkmate"). Kim Galbraith and U.S. Bank were informed and agreed with this decision. Neither Josh Estes, Kim Galbraith nor anyone else at U.S. Bank informed us that this would be a violation of any escrow agreements to divert the prior funds to the new entity second escrow.

24. Kim Galbraith and U.S. Bank were informed and understood that the use of a new escrow for the same film project was designed to keep Stereoscope and its

EXHIBIT F

- 4 -                                          -31-

investors in the dark as to continuing efforts to fund the project with the released funds.

25.    Josh Estes, Kim Galbraith and U.S. Bank were fully aware that the $500,000 which served as the good faith deposit to the Checkmate escrow was part of the $700,000 removed from the Liberty City escrow that had been deposited by the Stereoscope investors.

26.    I later learned that one or more principals from Quest Capital Finance were targeted by the FBI and that based on the FBI investigation, Quest principals Damien Hess and Lucas Ford were indicted and convicted of a scheme to defraud victims who had placed similar 4% good faith deposits as Stereoscope into Quest Capital escrow accounts.

27.    I recently learned that Damien Hess is serving a 5-year prison term for loan fraud based on thefts from borrower escrow accounts.

28.    I wish someone would have advised me against following the advice of Josh Estes, Kim Galbraith and U.S. Bank concerning the release to TREG of the funds from escrow.

29.    I had to approach the writer(s) and filmmakers many of whom are from my community in South Florida as well as others who were to be involved in the production of Liberty City that this entire production would not occur. The fact that the movie would not occur had a direct and adverse effect on all these people. So I'm

**EXHIBIT F**



1  quite upset and pissed still years later with Kim Galbraith, Josh Estes and U.S. Bank

2  that they allowed this to happen for what now seems like their own personal gain.

3

4      30.     Liberty City was to be a story about the neighborhood culture and city

5  where  the writer and I grew up. The money my high school friend and writer Juan

6  Jackson would have made from this film would have gone into taking care of his sick

7

8  mother who's battling Alzheimer's.

9      31.     I feel that Kim Galbraith and Josh Estes manipulated their position of

10 trust and influence in order to leave me as a patsy to their fraud.

11

12     32.     I spent years building TREG (The Reserve Entertainment Group, Inc.)

13 and its relationships and because of Josh Estes, Kim Galbraith and U.S. Bank and

14 their advice and mishandling of this deal, it destroyed my company resulting in me

15

16 having to file for bankruptcy and me being personally sued for money I did not have

17 all because I wanted to tell my story through Liberty City.

18     I declare under penalty of perjury under the laws of the State of California that

19 the foregoing is true and correct to the best of my knowledge.

20

21     Executed on December  7 , 2016, at Los Angeles, California.

22

23

24

25                              LaMont Cain

26

27                         **EXHIBIT F**

28                              -33-
                              - 6 -
                    DECLARATION OF LAMONT CAIN

## DECLARATION OF ALLEN BATES

I, Allen Bates, do hereby state and declare:

1.      I am the former President of the Beverly Hills, CA based film production company, The Reserve Entertainment Group, Inc. ("TREG"). If called as a witness, I could and would testify to the following:

2.      In July of 2011, TREG through its wholly owned subsidiary Cutting Edge Pictures, Inc. ("Cutting Edge") entered into a joint venture with a Burbank, California, based production company known as Stereoscope, LLC ("Stereoscope"). In furtherance of the joint venture, the entity known as Cutting Edge Stereoscope Motion Pictures, LLC was formed with Cutting Edge and Stereoscope designated as Members.

3.      The joint venture was created to exploit intellectual property that TREG had options to purchase the rights to exploit. Funding to purchase the rights for the first film Liberty City and the entire slate of films to be exploited was being sought, and accordingly, TREG developed a relationship with Quest Capital Finance ("Quest") a financing company with lending programs suitable for a film production company. Josh Estes was our primary contact at Quest.

4.      I understood that LaMont Cain had no previous relationship with Josh Estes and Quest Capital Finance.  I learned that Quest Capital Finance had various

- 1 -

DECLARATION OF ALLEN BATES

**EXHIBIT G**

-34-

lending programs for film production financing, including one which required a good faith deposit equal to 4% of the overall loan amount to be placed in an escrow account pending closing of the loan. The 4% deposit was to be released back to the provider of funds when the loan either closed or when the escrow was terminated.

5. Stereoscope raised $708,000 from various investors per terms of the JV agreement with such funds to serve as a good faith deposit as required by our lender Quest Capital Finance and for purposes of our first film, Liberty City.

6. Initially it was contemplated that Stereoscope's attorney Richard Garzilli would serve as the escrow agent.

7. Prior to the investor funds transfer by Stereoscope's attorney Richard Garzilli, I understand that Josh Estes and his associates were now working for a new lending company known as EB Capital, LLC ("EB Capital") with such new lender becoming the film production financier.

8. Prior to opening of escrow, we were informed by Josh Estes now of EB Capital that it was a requirement of the loan that we use U.S. Bank for escrow purposes and specifically that the escrow agent had to be Kim Galbraith who was a Vice President at U.S. Bank's Salt Lake City office.

9. Stereoscope and its' investors were very careful not to provide the funds directly to the joint venture or to the company, Liberty City Movie, LLC which TREG controlled and instead insisted that the funds be initially held in their attorney's trust account. It was understood that such investor funds would be directly

- 2 -

DECLARATION OF ALLEN BATES

wired from Stereoscope's attorney to the U.S. Bank escrow account maintained for the EB Capital loan to Liberty City Movie, LLC.

10. Upon identification of the account coordinates, escrow agent and escrow institution, per terms of the JV agreement, Stereoscope authorized Garzilli to wire the third party deposit of $708,000 to the escrow account maintained at U.S. Bank.

11. I understand that Stereoscope sent a notice via email to Kim Galbraith in May of 2012 clearly indicating that third party investors were the source of the deposit.

12. In June, 2012, and for the purposes of keeping Stereoscope and their investors informed, I arranged a conference call between myself, Kim Galbraith and David Kissell from Stereoscope to confirm the balance of funds in the escrow account. We also discussed the process by which escrow instructions could be delivered to US Bank.

13. In June, 2012, Kim Galbraith delivered a balance confirmation letter on US Bank letterhead regarding the funds in escrow which was forwarded to the principals of Stereoscope.

14. In early July of 2012, Liberty City Movie, LLC c/o TREG sent funds wiring instructions to US Bank indicating that the escrowed funds would be returned to Stereoscope's attorney Richard Garzilli should the escrow account be discontinued, cancelled or terminated. Should the loan close successfully, a total of

**EXHIBIT G**

- 3 -        **-36-**



$778,800 was to be wired to the client trust account of Stereoscope's attorney Richard Garzilli.

15.     Although Kim Galbraith and U.S. Bank were aware that the source of the escrow deposit was Stereoscope's third party investors, neither Kim Galbraith nor anyone else at U.S. Bank ever requested a third party authorization form from Stereoscope or the investors and to my knowledge no third party authorization form was ever submitted to U.S. Bank.

16.     During the course of the escrow, I learned that there were expectations on the part of Kim Galbraith that he would receive an executive producer's credit and fee payable from the film budget of our project Liberty City. No one to my knowledge ever communicated this to Stereoscope or its third party investors. This was the first I learned that Mr. Galbraith was acting in a capacity other than as a neutral escrow agent.

17.     In early November of 2012, Stereoscope indicated to us that they would be bringing a legal action seeking a return of the escrowed capital.  I responded suggesting legal action was unnecessary and an easier resolution could be achieved.

18.     Shortly thereafter we received a formal Demand for Arbitration from Stereoscope's attorneys.

19.     Shortly thereafter new instructions were submitted to Kim Galbraith and U.S. Bank in November 2012 requesting that a majority of the escrowed funds be released from escrow and sent directly and immediately to TREG's corporate bank

- 4 -

DECLARATION OF ALLEN BATES       EXHIBIT G

account.  I later learned that it was Josh Estes who advised of this course of action.

Neither Kim Galbraith nor U.S. Bank requested a third party authorization for such

release of funds from the escrow account.

20.    Kim Galbraith and U.S. Bank kept the escrow account open with a

nominal balance in place in order to avoid notification to Stereoscope and the third

party investors that the escrowed funds had been removed from the U.S. Bank escrow

account and to allow for the loan funds, when received, to be placed back in the

escrow account.

21.    Kim Galbraith and U.S. Bank understood that keeping the account

active was a necessary step to allow us interim use of the funds and to leave open the

possibility of a return of funds without the knowledge of Stereoscope or any third

parties.  Neither Kim Galbraith nor anyone at U.S. Bank ever apprised us, or to my

knowledge anyone else affiliated with TREG, that removing the escrow funds or an

interim advance was prohibited by the terms of the escrow agreement.

22.    Prior to the Stereoscope investor funds being released from the Liberty

City escrow account, Kim Galbraith and US Bank had been told by an executive from

Stereoscope that the funds were provided by Stereoscope's investors and that any

funds transfer was not authorized by Stereoscope or its investors.

23.    At no point was it my intent not to make Stereoscope and its investors

whole.

### EXHIBIT G

-38-

- 5 -

DECLARATION OF ALLEN BATES

24.    It was always my intent and I understood it to be the intent of the TREG team that we were going make this film.  It should be noted as things began to unravel my position did not allow me the power to stop the process.

25.  I later learned that Josh Estes was under investigation by the FBI for his participation in fraudulent activities.

26. I feel that Kim Galbraith and Josh Estes manipulated their position of trust and influence in order to leave me as a patsy to their fraud.

27.  The failure of this project, due to those behaviors, and the ensuing litigation severely impacted my professional career.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.

Executed on December 7, 2016, at Los Angeles, California.


Allen Bates


EXHIBIT G

-39-

- 6 -

DECLARATION OF ALLEN BATES